691 A.2d 1369

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. GERALD MANCE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 11, 1997—Decided April 21, 1997.

38

Before Judges MICHELS, MUIR, Jr., and COBURN.

*Susan L. Reisner,* Public Defender, attorney for appellant (*Sonia G. Wagner,* Designated Counsel, of counsel and on the brief).

*Peter Verniero,* Attorney General, attorney for respondent (*Bennett A. Barlyn,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

COBURN, J.S.C. (temporarily assigned).

On August 10, 1990, inmates rioted at the New Jersey State Prison. The Mercer County Grand Jury returned an eighteen count indictment against seven of the inmates, defendants Gerald Mance, Eugene Belton, Murray Whitfield, Ogbonna Khalfani, William E. Jones, Eugene Jones and Keith Bowman. Count I charges them with first degree attempted murder of Captain James Johnston (*N.J.S.A.* 2C:11–3, *N.J.S.A.* 2C:5–1, and *N.J.S.A.* 2C:2–6); count II charges them with second degree aggravated assault upon Captain James Johnston (*N.J.S.A.* 2C:12–1b(1) and *N.J.S.A.* 2C:2–6); and count III charges them with third degree aggravated assault upon Captain James Johnston (*N.J.S.A.* 2C:12–1b(5)(a) and *N.J.S.A.* 2C:2–6).

Counts IV, V, and VI of the indictment relate to Senior Corrections Officer Manuel Ayala and counts VII, VIII, and IX relate to Senior Corrections Officer Leon Wilson. As to each, the charges as to all defendants are the same and in the same order as those levied with respect to Captain Johnston.

Counts X and XI charge defendants with second degree attempted aggravated assault (*N.J.S.A.* 2C:12–1b(1) and *N.J.S.A.* 2C:2–6) and third degree aggravated assault (*N.J.S.A.* 2C:12–1b(5)(a)), respectively, with regard to Corrections Officer Recruit Jose Rivera.

Counts XII and XIII charge defendants with second degree attempted aggravated assault (*N.J.S.A.* 2C:12–1b(1) and *N.J.S.A.* 2C:2–6) and fourth degree attempted aggravated assault (*N.J.S.A.*

2C:12–1b(1) and *N.J.S.A.* 2C:2–6), respectively, with regard to Corrections Officer Sergeant Bradley Boyd. Counts XIV and XV make the same allegations in the same order with regard to Senior Corrections Officer Rita Duffy; and counts XVI and XVII make the same allegations in the same order with regard to Senior Corrections Officer Ray Phelps. Finally, count XVIII charges defendants with third degree possession of weapons, "shanks", metal weights, and table legs with the purpose to use them unlawfully against the person of another (*N.J.S.A.* 2C:39–4d and *N.J.S.A.* 2C:2–6).

The petit jury acquitted defendants Keith Bowman and Eugene Jones. Defendant Mance was convicted on counts II, III, IX, and XVIII. Defendant Belton was convicted on counts II, III, IX, XVII, and XVIII. Defendant Whitfield was convicted on counts III, IX, and XVIII. Defendant Khalfani was convicted on count IX. Defendant William E. Jones was convicted on count IX. The jury acquitted these defendants on the remaining counts of the indictment.

Defendants filed separate appeals. In this opinion, we will consider the points raised by defendant Mance. To the extent that the co-defendants have raised the same issues, the opinions filed as to each co-defendant shall incorporate by reference the applicable sections of this opinion. In each case, we affirm the conviction. However, with the exception of defendant William E. Jones, we reverse the sentences imposed on each defendant and remand for resentencing.

I

In a sudden, unprovoked and planned attack on the morning of August 10, 1990, armed inmates at the New Jersey State Prison (then known as Trenton State Prison) turned on their guards. In the ensuing melee, numerous officers were injured. Captain James Johnston was repeatedly stabbed in the chest, face and arm. He was also beaten in the head with a weight. He spent a week in the hospital with a collapsed lung as a result of the stab

wounds. Officer Wilson was struck in the head, stabbed and kicked repeatedly, and had his cheekbone crushed by a weight. The attack rendered him unconscious. He was hospitalized for four days. Officer Ayala was beaten and stabbed. He suffered multiple broken facial bones, a sprained wrist, and tooth damage. He spent seven days in the hospital. Officer Rivera was treated for a puncture wound of his wrist. Other officers suffered minor injuries.

Before the trial began, the trial judge held a hearing on the question of whether defendants should remain in shackles during the trial. In that regard, he noted that defendant Mance was serving prison terms in excess of fifty-one years, having been convicted of homicide, rape, assault, robbery, and weapons offenses. His prison record contained over 100 disciplinary infractions. Defendant Belton was serving a life term for murder. He had more than seventy-five prison infractions. Defendant Whitfield was serving a forty-five year sentence for armed robbery, kidnapping, and conspiracy and had over 125 prison infractions. Defendant Khalfani was serving a thirty year term for attempted murder, aggravated assault, armed robbery, robbery and drug offenses. He had more than thirty disciplinary infractions. Defendant William E. Jones was serving in excess of forty-four years, having been convicted of aggravated assault, robbery, conspiracy, weapons violations and resisting arrest. He had more than thirty-five disciplinary infractions. Defendant Bowman was serving thirty-six years in relation to charges for homicide, conspiracy, drug violations, and weapons offenses. He had accumulated ten prison infractions. Defendant Eugene Jones was serving a thirty year sentence for homicide and had been cited for infractions on more than fifteen occasions.

The attacks occurred in an eight-foot wide, 121 foot long room known as the gym corridor. At one end of the room was a heavy metal door which led to a reinforced sliding mesh fence and then to a recreation yard. At the other end of the room was another metal door, known as the 1-D door, which led to the interior of the

prison. A metal detector was located in the gym corridor near the 1–D door. The corrections officers were aware of rumors that some kind of protest demonstration might occur that day. As a result, Captain Johnston had increased the number of officers. He located himself against a wall in the gym corridor near the outside door to supervise the movement of prisoners from the recreation area through the gym corridor. Sergeant Boyd took up a position near the other wall opposite Captain Johnston. Officers Ayala, Duffy, Phelps, Rivera, Wilson, and Leon H. Smith were standing near the metal detector. The first group of approximately twenty prisoners passed through uneventfully and exited the 1–D door.

Sergeant Boyd then instructed the yard-gate officer to allow the second group of prisoners to enter the gym corridor. Defendant Mance entered first. He silently faced Sergeant Boyd, then removed a home-made knife, known as a shank, turned on Captain Johnston and repeatedly plunged the knife into Johnston's body. Defendant Belton entered next with a shank clenched in his upraised hand. He struck Boyd, knocking him into the metal detector, turned on Johnston and stabbed him. Sergeant Boyd depressed an emergency alarm button, which broadcast the alarm on the prison's public address system. Several prisoners including defendants Whitfield, Khalfani and William E. Jones then entered into the gym corridor.

Mance, Belton and Whitfield attacked Johnston again, violently shoving him against the wall. They punched and stabbed him and Mance swung a five-pound weight into his face and head. Officer Ayala went to assist Johnston and was knocked over and attacked with a shank. He was struck by shanks repeatedly in the stomach and back and his left hand was pierced.

Officer Wilson was approached by Mance, Belton, William E. Jones, Khalfani and Whitfield who walked towards him "shoulder to shoulder." Wilson saw a metallic "glitter" pass between Whitfield and Khalfani and another "glitter" pass between William E. Jones and Belton. He saw a "glitter" on Mance. They struck

him and he went down. Belton and Whitfield kicked him in the head, rendering him unconscious. Another prisoner repeatedly struck Wilson with a table leg which he had torn from a wooden table next to the metal detector. Officer Ayala tried to assist Wilson. Mance struck Ayala with a steel weight. Other inmates then kicked him and hit him with objects.

Captain Johnston started to move towards the 1–D door when Mance and Belton attacked him again. They stabbed him again and again they struck him with a steel weight. At this point, Officers Duffy, Boyd, Phelps, and Rivera had been forced back to the area of the 1–D door. Just before they managed to get through the 1–D door to safety, defendant Belton, while standing directly in front of Officer Phelps, repeatedly tried to stab him in the face with his shank.

The prisoners then heard the steps of the first emergency response team approaching from the other side of the 1–D door. They immediately fled from the gym corridor into the recreation area, leaving behind the bleeding and bludgeoned, unconscious bodies of Captain Johnston, and Officers Wilson and Ayala. The attacks had taken only several minutes and had been carried out in complete silence.

As the prisoners were being subdued in the recreation area, defendant Whitfield was in possession of a shank. Another shank fell out of William E. Jones's green coat and defendant Bowman had a shank tucked into his waistband. Other shanks were found around the recreation area. The clothing of defendants William E. Jones, Mance, and Belton all contained human blood according to Joseph Petersack, a forensic science expert. He also found human blood on a steel barbell and on a broken table leg.

## II

Defendant Mance has raised the following points of alleged error:

POINT I  THE TRIAL COURT DENIED DEFENDANT MANCE'S FEDER-
AL AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL

WHEN HE WAS COMPELLED TO APPEAR BEFORE THE JURY WITH HIS HANDS AND FEET SHACKLED.

POINT II   THE TRIAL COURT DENIED DEFENDANT MANCE'S FEDERAL AND STATE CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN IT DENIED HIS MOTION FOR A CHANGE OF VENUE.

POINT III   THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT MANCE'S MOTION FOR SEVERANCE OF HIS CASE FROM THOSE OF HIS CO-DEFENDANTS.

POINT IV   THE TRIAL COURT ABUSED ITS DISCRETION, COMMITTED ERROR CAPABLE OF PRODUCING AN UNJUST RESULT, AND VIOLATED DEFENDANT MANCE'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT DENIED HIS APPLICATION FOR A CONTINUANCE.

POINT V   THE TRIAL COURT ERRED IN REFUSING TO ASK THE POTENTIAL JURORS DURING *VOIR DIRE* IF THEY HAD READ AN INFLAMMATORY NEWSPAPER ARTICLE.

POINT VI   THE STATE'S FAILURE TO PROVIDE DISCOVERY TO DEFENDANT MANCE IN A TIMELY MANNER AND THE TRIAL COURT'S SUBSEQUENT FAILURE TO GRANT A CONTINUANCE IN ORDER TO PERMIT DEFENDANT TO REVIEW THE DISCOVERY WAS AN ABUSE OF DISCRETION, ERROR CAPABLE OF PRODUCING AN UNJUST RESULT, AND A DENIAL OF DUE PROCESS IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS.

POINT VII   THE TRIAL COURT'S EXCUSING OF ONE JUROR WHILE REFUSING TO ADVISE COUNSEL OF HIS REASON FOR DOING SO AND HIS SUBSEQUENT REFUSAL TO GRANT A MISTRIAL WHEN ANOTHER JUROR FLIRTED WITH ONE OF THE PROSECUTION WITNESSES WAS ERRONEOUS, AN ABUSE OF DISCRETION, AND VIOLATED DEFENDANT MANCE'S FEDERAL AND STATE CONSTITUTIONAL RIGHT TO A TRIAL BY AN IMPARTIAL JURY.

POINT VIII   THE OUT-OF-COURT DISPLAY OF DEFENDANT MANCE'S PHOTOGRAPH TO OFFICERS RIVERA AND WILSON VIOLATED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL AND THE LINE-UP DISPLAY OF DEFENDANT MANCE TO CAPTAIN JOHNSON DURING TRIAL VIOLATED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO COUNSEL, DUE PROCESS, AND A FAIR TRIAL.

POINT IX   THE TRIAL JUDGE'S REFUSAL TO PERMIT CROSS-EXAMINATION OF A CORRECTIONS OFFICER REGARDING HIS DENIAL THAT HE HAD VIOLATED THE CIVIL RIGHTS OF INMATES IN THE PAST VIOLATED DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHT OF CONFRONTATION, WAS ERROR

CAPABLE OF PRODUCING AN UNJUST RESULT, AND WAS AN ABUSE OF DISCRETION.

POINT X   THE TRIAL COURT'S REFUSAL TO PERMIT DEFENDANT MANCE TO PRODUCE EVIDENCE REGARDING HIS NON–INVOLVEMENT IN INCIDENTS AT THE PRISON ON JULY 29 AND AUGUST 7 FOR THE PURPOSE OF DEMONSTRATING THAT HE LACKED THE MOTIVE TO PARTICIPATE IN THE ASSAULT ON THE CORRECTIONS OFFICERS ON AUGUST 10 WAS ERROR CAPABLE OF PRODUCING AN UNJUST RESULT AND WAS AN ABUSE OF DISCRETION.

POINT XI   THE STATE'S FAILURE TO PROVIDE TO DEFENDANT MANCE DISCOVERY WHICH HAD NOT BEEN MADE PART OF A WRITTEN REPORT OR STATEMENT WAS AN ABUSE OF DISCRETION, ERROR CAPABLE OF PRODUCING AN UNJUST RESULT, AND A DENIAL OF DUE PROCESS IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS.

POINT XII   THE TRIAL COURT'S PROHIBITION UPON DEFENDANT MANCE'S CROSS–EXAMINATION OF A CO–DEFENDANT'S WITNESS BY ASKING HIM LEADING QUESTIONS VIOLATED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT OF CONFRONTATION, WAS ERROR CAPABLE OF PRODUCING AN UNJUST RESULT, AND WAS AN ABUSE OF DISCRETION.

POINT XIII   THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT REFUSED TO PERMIT A SPOKESPERSON FOR THE DEPARTMENT OF CORRECTIONS TO TESTIFY REGARDING INFORMATION SHE RECEIVED FROM THE DEPARTMENT OF CORRECTIONS.

POINT XIV   THE TRIAL COURT'S FAILURE TO CHARGE THE JURY REGARDING FOURTH DEGREE AGGRAVATED ASSAULT AND ITS INSTRUCTION REGARDING CONSPIRACY CONSTITUTED PREJUDICIAL ERROR, AN ABUSE OF DISCRETION, AND A DENIAL OF DEFENDANT MANCE'S RIGHT TO DUE PROCESS AND A FAIR TRIAL, IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS.   (THIS POINT NOT RAISED BELOW IN PART.)

POINT XV   THE TRIAL JUDGE ERRED IN FAILING TO MERGE DEFENDANT MANCE'S CONVICTION FOR POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE WITH HIS CONVICTIONS FOR AGGRAVATED ASSAULT.

POINT XVI   DEFENDANT MANCE'S SENTENCE TO AN AGGREGATE TERM OF THIRTY YEARS WITH A MANDATORY MINIMUM SENTENCE OF FIFTEEN YEARS VIOLATED SENTENCING GUIDELINES AND WAS EXCESSIVE.

POINT XVII   THE TOTALITY OF THE TRIAL ERROR IN THIS MATTER DENIED DEFENDANT MANCE A FAIR TRIAL.   (THIS POINT WAS NOT RAISED BELOW.)

### III

In his Point I, defendant Mance contends the trial court erred in granting the state's motion to have all defendants physically restrained throughout the trial by individual arm and leg chains. Defendant Mance and the other defendants contend this violated their right to a fair trial under the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. *State v. Damon,* 286 *N.J.Super.* 492, 496, 669 *A.*2d 860 (App.Div.1996); *State v. Roberts,* 86 *N.J.Super.* 159, 164, 206 *A.*2d 200 (App.Div.1965). They also argue that the trial court erred by failing to instruct the jury "in the clearest and most emphatic terms that it give such restraint no consideration whatever in assessing the proofs and determining guilt." *State v. Roberts, supra,* 86 *N.J.Super.* at 168, 206 *A.*2d 200. However, defendants also point to the statement in *Roberts* that "[i]t may be doubted whether any jury, even with the best of cautionary instructions, can ever dismiss from its mind that the accused has appeared before it in handcuffs or chains." *Ibid.* They then argue that no instruction could have emanated from the trial court which would have altered the prejudicial impact of the restraints in the circumstances of this case. And, indeed, no defendant requested any instruction on the subject. The trial court, however, did question the jurors during the voir dire to determine that the presence of restraints would not prejudice them. No selected juror indicated that the presence of the restraints would affect his or her judgment in the case.

The judiciary has long recognized a defendant's freedom from restraints as an important aspect of a fair trial. *Roberts, supra,* 86 *N.J.Super.* at 163, 206 *A.*2d 200. However, there are circumstances under which a trial judge may exercise discretion to order restraints. *Id.* at 164, 206 *A.*2d 200. Restraints may be necessary when a defendant exhibits violent conduct at the time of trial or threatens escape. *Id.* at 164–66, 206 *A.*2d 200. Moreover, there are other circumstances under which the judge may exercise discretion and order restraints. For instance, a defendant's char-

acter, reputation, or criminal record may indicate a need for physical restraints.  *Id.* at 166, 206 *A.*2d 200.

Neither *Roberts* nor *Damon* prohibit the use of restraints. Both cases recognize, of course, that restraints may only be used in exceptional circumstances.  *Roberts* requires the trial judge to hold a hearing on the question and to set forth on the record the reasons for ordering restraints.  The trial judge followed precisely that course.  *Damon* disapproved of the trial court's decision to restrain defendant simply because the courtroom lacked sufficient security personnel.  As pointed out by the judge, both *Roberts* and *Damon* are clearly distinguishable from the instant case.  We affirm his order based on the reasons he gave in his carefully written opinion of December 1, 1992.  We note in passing that in this multi-defendant case, the trial court was confronted with the presence of seven defendants whose criminal records for violence were remarkable.  They were all serving long prison terms and had all repeatedly violated prison regulations.  Three of them had killed before and one had attempted murder.  Since the incident occurred in State Prison, the jury would know they were all prisoners.  Also, the case did not involve any serious question about what occurred.  Rather, the defense was based on the question of identification.  We cannot perceive any alternative open to the trial court in this case which would have alleviated the prejudice to defendants.  Without restraints, the courtroom would have had to have been filled with so many sheriff's officers that the message allegedly feared by defendants would have been the same, if not worse.  In short, given all the circumstances of this case, the trial court soundly exercised its discretion in ordering the restraints.  *See generally,* Sheldon R. Shapiro, Annotation, *Propriety and Prejudicial Effect of Gagging, Shackling, or Otherwise Physically Restraining Accused During Course of State Criminal Trial,* 90 *A.L.R.*3d 17 (1979).

■ As previously noted, no defendant requested a charge regarding the restraints.  Thus, defendants must rely upon plain error.  *R.* 2:10–2.  In considering a jury charge, plain error is

"legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock*, 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied*, 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970). Among other things, the verdicts show the jury was not prejudiced. Two defendants were found not guilty on all charges. Two defendants were convicted only of third degree aggravated assault. One defendant was convicted on only two counts of third degree assault and one count of weapons possession. The other two defendants were only convicted on four and five counts of this eighteen count indictment. No defendant was convicted of the most serious charge, first degree attempted murder. Finally, the jurors selected had all agreed that the shackling would not influence their decisions.

## IV

In his point II, defendant Mance contends the trial court erred in denying his motion for a change of venue to a more secure courthouse on the theory that restraints would not then be required. Under *R.* 3:14–2, a motion for change of venue is addressed to the sound discretion of the trial court. Here the trial court determined that restraints would be required to protect court personnel, the jury, witnesses, and the guards themselves wherever the case was tried. The facts of this very case make that conclusion self-evident. The trial court acted well within its sound discretion.

## V

In his point III, defendant Mance complains that the trial court erred in denying his motion for a severance. The trial court said:

> The Court cannot conclude that the sound use of discretion would require two, three or even possibly seven trials here. No court has that much time. The proofs

to be presented are going to be relative to a particular day in a correctional institution and the Court concludes that because of that, there is every reason to try these cases together and very little reason not to.

Severance rests within the trial court's sound discretion and its decision in that regard is entitled to great deference on appeal. *State v. Brown,* 118 *N.J.* 595, 603, 573 *A.*2d 886 (1990). A trial court may grant severance if it appears that the defendant would be prejudiced by joinder of all of the defendants at trial. *R.* 3:15-2(b). *See also, State v. Sanchez,* 143 *N.J.* 273, 282–83, 670 *A.*2d 535 (1996); *State v. Brown, supra,* 118 *N.J.* at 605, 573 *A.*2d 886. A trial judge's decision in deciding a severance motion will not be reversed absent a clear abuse of discretion. *State v. Melendez,* 129 *N.J.* 48, 56, 609 *A.*2d 1 (1992). In deciding a severance motion, the judge balances the State's interest in judicial economy against the potential prejudice to a defendant. *State v. Sanchez, supra,* 143 *N.J.* at 282, 670 *A.*2d 535.

This was not a circumstance where a significant portion of the evidence to be adduced at trial is admissible only as to one defendant thereby causing prejudice to other defendants. *See State v. Hall,* 55 *N.J.Super.* 441, 451, 151 *A.*2d 1 (App.Div.1959). These defendants were obviously acting together and the evidence was arguably admissible as to all. Moreover, joint trials are preferable when the crimes arise from the same series of acts. *State v. Brown, supra,* 118 *N.J.* at 605, 573 *A.*2d 886. The entire incident spanned a few minutes. Numerous witnesses would have been required regardless of the number of defendants tried and thus separate trials would have consumed an undue amount of judicial and prosecutorial time. In these circumstances "a joint trial is preferable." *Ibid.* The trial court's exercise of discretion on this point is entitled to be honored.

## VI

In his Point IV, defendant notes that prior to jury selection, he asked for a continuance because of an ongoing prison hostage situation in Ohio. The trial court agreed to question prospective jurors on the matter and did so. No juror indicated

that the event in Ohio would affect his or her judgment. The denial of the continuance request was well within the trial court's discretion and will not be disturbed on appeal. *State v. Lamb,* 125 *N.J.Super.* 209, 213, 310 *A.*2d 102 (App.Div.1973).

## VII

In his Point V, defendant complains about the alleged failure of the trial court to question prospective jurors about an inflammatory newspaper article which appeared during jury selection. The article appeared in the April 21, 1993 edition of *The Trentonian.* It discussed the tightened security at the trial due to the possibility of an escape and mentioned that defendants were part of the Black Liberation Army. The court asked the prospective jurors if they had read any newspaper that morning. None had. The judge then instructed the jurors not to read any articles · about the case. A trial court exercises its discretion when it *voir dires* a jury, and the exercise of that discretion is subject to reversal only if defendant meets the burden of showing prejudice. *State v. Morales,* 116 *N.J.Super.* 538, 542, 283 *A.*2d 127 (App.Div. 1971), *certif. denied,* 60 *N.J.* 140, 286 *A.*2d 513 (1972). In light of the trial court's inquiry and instruction, we view the defendant's claim of error as meritless.

## VIII

In his Point VI, defendant contends the trial court erred in refusing a continuance when the prosecutor provided late discovery. In fact, the trial court adjourned the proceedings for a day to permit defense review of the documents in question. While defendant concludes that he was thereby prejudiced, he offers no specifics in that regard. Thus, the trial court's exercise of discretion is entitled to our support. *State v. Lamb, supra,* 125 *N.J.Super.* at 213, 310 *A.*2d 102.

## IX

In his Point VII, defendant contends the trial court erred when he excused a juror without questioning her and the other

jurors with regard to any comments she might have made to other jurors. He contends further that the trial court erred in failing to comply with his request that jury selection be re-opened.

After jury selection was completed on Thursday April 22, 1993, the trial court excused the panel pending resolution of various pretrial matters. On Monday April 26, 1993, the trial court informed counsel that one juror, Mrs. Justice, had called him on Friday April 23, 1993. Because she was emotionally upset, the trial court advised counsel that he had decided to excuse her as a juror. Counsel for defendant Mance asked for interrogation of the jurors with respect to possible taint, for the specifics of what Mrs. Justice had said to the court, and for the re-opening of jury selection. The trial court denied these requests since it was satisfied that the juror's inability to serve was based on reasons peculiar to her which would not have tainted the jury, that the nature of her disclosures showed she had not spoken to the other jurors, and there were alternate, qualified jurors who could take her place. At the conclusion of the trial the court placed the details of the conversation with Mrs. Justice on a sealed record. She had stated that she felt her life was in danger unless she acquitted the defendants and she felt that she could not be impartial. She told the court she had been crying all night; and she was crying when she spoke on the telephone to the court.

If the trial court excuses a juror after being sworn and before opening statements, an alternate juror may be impanelled and sworn. *R.* 1:8–2(d). Moreover, the court may excuse any juror where good cause for removal is shown. *Ibid.*

Dismissal of a juror is committed to the sound discretion of the trial court. *State v. Miller,* 76 *N.J.* 392, 407, 388 *A.*2d 218 (1978). A reviewing court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in refusing to excuse the juror or the defendant suffered harm. *State v. LaBrutto,* 114 *N.J.* 187, 207, 553 *A.*2d 335 (1989). Good cause for excuse of a juror includes the situation where a juror avers that in her "nervous and emotional condition, [s]he did

not think [s]he could render a fair verdict." *State v. Miller,*
*supra,* 76 *N.J.* at 407, 388 *A.*2d 218. Defendant has pointed to no
authority which would require re-opening of the jury selection
process in the present circumstances and the practice followed by
the trial court here accords with *R.* 1:8–2(d). *See* Pressler,
*Current N.J. Court Rules,* comment 5 on *R.* 1:8–2(d) (1997).

▇▇ Defendant Mance also contends the trial court erred in
failing to comply with his request for a mistrial based on the
alleged misconduct of another juror, Mrs. Matlock. The matter
was brought to the attention of the trial court when Mance's
attorney advised the court that during the taking of testimony
from Corrections Officer Fred Thomas, Jr., the juror was "making
gestures and pointing and attempted to mouth some words to
somebody." He believed she was attempting to communicate with
a corrections officer assigned to guard Mance. He further
claimed that she had been inattentive, laughing and speaking to
the juror next to her. The trial court indicated that he had not
observed the conduct in question, but that he had noticed Matlock
smiling and laughing at some remarks addressed by two of the
other defendants to the court.

The judge questioned Mrs. Matlock in chambers. She admitted
making eye contact with one of the corrections officers. She said
she was joking with respect to Officer Thomas's large size. He
weighed about 300 pounds. She made some indication that Thom-
as was "[her] kind of man." She also admitted to having eye
contact with two of the defendants, stating, "I mean, alot of guys
are flirting. That's all." She averred that none of these matters
would in any way affect her judgment in the case. The court
ordered her not to discuss the matter with other jurors and
reminded her that the case was a "serious matter." With respect
to the juror's ability to render a fair verdict, the trial court said it
"puts no stock in [her behavior] as an indication of bias or
anything of the kind. This has been a prolonged trial. The
jurors' attention wanders for a minute or two. That is clearly
understandable."

Although the juror's conduct was inappropriate, it did not warrant a mistrial or removal of the juror from the trial. Defendant relies upon *State v. Marchitto*, 132 *N.J.Super.* 511, 514–17, 334 *A.*2d 354 (App.Div.), *certif. denied*, 68 *N.J.* 163, 343 *A.*2d 451 (1975), as warranting the judicial relief requested. However, in that case a juror had made a remark which the defense attorney believed to reflect antagonism towards the defense. Because the trial court refused to explore the matter with the juror, the conviction was reversed. Here, however, the matter was fully explored by the trial court and there was no indication of antagonism towards the defense. The trial court properly exercised its discretion in permitting the juror to continue sitting on the case. *R.* 1:8–2(d). A mistrial is an extraordinary remedy. Only when there has been an obvious failure of justice should it be employed. *State v. Perez*, 150 *N.J.Super.* 166, 171, 375 *A.*2d 277 (App.Div.), *certif. denied*, 75 *N.J.* 542, 384 *A.*2d 521 (1977). Since the court properly exercised its discretion in denying the motion for a mistrial, we perceive no basis for upsetting that decision. *State v. Winter*, 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984).

## X

In his Point VIII, defendant Mance contends that the out-of-court identifications of him by Captain Johnston, and Officers Rivera and Wilson were violative of *United States v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967) and its progeny.

Captain Johnston was initially shown photographs of the defendants and others five days after the incident while he was still in the hospital and heavily sedated. He was unable to identify anyone. However, he told the investigators that if he saw his attackers in person he believed he could make an identification. During the trial, while he was waiting outside the court room to testify, a lunch break occurred. At that point, the defendants in shackles were brought past him as they were being taken to eat. He recognized Mance and Belton as two of the men who had attacked him, though he did not know their names. He provided

this information to the State. A *Wade* hearing ensued outside the presence of the jury. He testified in detail as to his opportunities to observe Mance and Belton as they attacked him on two occasions on August 10, 1990. He also identified defendant Whitfield. He stated that he was positive of his identification of Mance.

Investigator Worthington of the prosecutor's office testified that he had arranged for Johnston to be outside the courtroom that morning because he expected him to begin testifying before the lunch break. He had no idea that the defendants would be coming through the hallway when they. did. Nor did he conceive that Johnston would see them in the hallway.

In determining the admissibility of an eye witness's identification, a court must decide whether the identification procedure was impermissibly suggestive, and, if so, whether the procedure " '[gave] rise to a very substantial likelihood of irreparable misidentification.' " *State v. Madison*, 109 *N.J.* 223, 239, 536 *A.*2d 254 (1988).

The trial court concluded that the identification was not impermissibly suggestive. The trial court found as a fact that the exposure of the defendants to Johnston was inadvertent. The court further determined that no one had done or said anything to influence Johnston's identifications, and then went on to find that the identifications were reliable. The court's findings of fact were based on credible evidence and are entitled to our respect. *Rova Farms Resort, Inc. v. Investors Ins. Co. of America*, 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974); *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964).

Since the encounter in the courtroom corridor was inadvertent *Wade* is not implicated even though defense counsel was absent. *United States v. Jackson*, 448 *F.*2d 963, 967 (9th Cir.1971), *cert. denied*, 405 *U.S.* 924, 92 *S.Ct.* 970, 30 *L.Ed.*2d 796 (1972). Nor are such accidental courthouse encounters unduly suggestive *per se. See, e.g., United States v. Colclough*, 549 *F.*2d 937, 941–42 (4th Cir.1977). Here seven shackled defendants passed by the witness.

Although he obviously knew they were the defendants in this case, there was nothing to indicate which of them were the men who attacked him. Therefore, there was no suggestibility with regard to his specific identifications of two of the seven as his attackers. *See, e.g., State v. Long*, 119 *N.J.* 439, 493–94, 575 *A*.2d 435 (1990).

Defendant bears the burden of proving by a preponderance of the evidence that a pretrial identification procedure was so suggestive as to result in a substantial likelihood of misidentification. *State v. Hurd*, 86 *N.J.* 525, 548, 432 *A*.2d 86 (1981). The trial court's determination that defendant had failed to meet his burden of proof is well supported by the record and, thus, cannot be disturbed on appeal. *Rova Farms Resort, Inc., supra; State v. Johnson, supra.*

Defendant also contends that the identifications of him by Officers Rivera and Wilson were inadmissible under *Wade*. However, he offers no evidence to support that proposition. Indeed, his arguments are really addressed to the weight of their evidence respecting identification and not to suggestibility. Defendant's point in this regard is without merit and does not warrant discussion. *R.* 2:11–3(e)(2).

## XI

In his point IX, defendant Mance contends the trial court erred in upholding the prosecutor's objection to a question posed to Captain Wilford Smith on cross-examination. The question was: "Well, weren't you, yourself, found liable for violating civil rights of inmates in another case?"

Captain Smith did not come onto the scene until after the inmates had fled back into the recreation area. He supervised and assisted in their capture. As part of the process he directed that the inmates be "cinched" to protect them from the guards and the guards from them because emotions were intense. The questioning then proceeded as follows:

Q. Plus, sir, you are aware of other incidents, are you not, where guards have beaten up on inmates, isn't that correct?

A. I'm not aware of incidents where guards have attacked inmates unjustifiably, I'm aware of accusations that guards have attacked inmates unjustifiably.

Q. Well, you're also aware of situations where guards have been found guilty of violating inmates' civil rights on those various grounds, isn't that true?

A. No, I don't think I recall that happening, I don't know.

Q. Well, weren't you, yourself, found liable for violating civil rights of inmates in another case?

Thereupon the objection was interposed, which the trial court sustained.

Defense counsel argued for admissibility on two grounds: (1) that based on the witness's previous answers with respect to his reason for cinching or ".dog locking" the inmates, it was a fair question "because it shows there is another intent in his mind, and that is to avoid another civil rights lawsuit at the Trenton State Prison"; and (2) that the answer would have been admissible under *Evid. R.* 20 (*N.J.R.E.* 607) to affect the witness's credibility.

The trial court sustained the objection because to allow an answer would "permit this case to become a trial on collateral issues as to what may have happened in another civil proceeding. It considers the area of inquiry to have little probative value attached to it, and under Rule 4 [now *N.J.R.E.* 403] it excludes it."

Defendant contends on appeal that two inferences could have been drawn from an answer to the question.

The first inference would have been that Smith had been untruthful when he testified that there had been no incidents where guards had attacked inmates unjustifiably. From this, the jury further could have inferred that Smith had been untruthful in his other testimony.

The second inference would have been that since the civil rights of inmates had been violated in the past, their civil rights might have been violated in the present incident, especially in view of Smith's concern that the officers would "pound on [the inmates]."

Defendant further contends that an answer to the question would have shown the witness's bias against these defendants.

There was no offer of proof with respect to what a truthful answer to the question would have been. Thus, to a large extent the defendant's argument is based on pure speculation. The first

inference which he suggests could have been drawn from evidence that the witness had been found civilly liable for violating the civil rights of inmates related to a purely collateral issue at best; i.e., whether he had truthfully testified that there were no incidents where guards had attacked inmates unjustifiably. This was, after all, merely an expression of an opinion, and had nothing to do with anything to which he had testified on direct examination. The second proposed inference, that this riot might have involved a violation of defendants' civil rights, was absurd in the context of this trial. Furthermore, the witness had testified that one of his reasons for ordering the use of the cinches was to protect the inmates from possible violence emanating from the guards who were particularly aroused by the circumstances.

Conceivably the existence of such a lawsuit against Smith might have borne on the question of bias, which is certainly admissible under *N.J.R.E.* 607. But this principle does not give "the cross-examiner . . . a license to roam at will under the guise of impeaching the witness." *State v. Pontery,* 19 *N.J.* 457, 473, 117 *A.*2d 473 (1955). As the Court in *Pontery* went on to explain:

> By the great weight of authority here . . . the trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is put in issue.
>
> [*Ibid.* (citations omitted).]

Here the trial court found that the probative value of the evidence was substantially outweighed by the risk of undue prejudice and would cause an undue waste of time. *N.J.R.E.* 403. Considering that Captain Smith was a co-worker of the victims, and indeed a victim himself, the jury was surely aware that his testimony might reflect, in part, his animus against inmates who engaged in an uprising. An answer to the question indicating that he had been the subject of a civil suit for violating inmates' civil rights would have added little, if anything, to the case. Furthermore, he was not even a witness to the main events since he only arrived after the inmates had fled to the recreation area. Finally, his testimony was corroborated by many other witnesses. The exclusion of evidence is within the trial court's discretion. On appeal, the

ruling is not disturbed unless there is a clear abuse of discretion. *State v. Wise*, 19 *N.J.* 59, 98, 115 *A.*2d 62 (1955). We perceive no abuse of discretion in the particular circumstances of this case. Moreover, "[e]ven where there may have been error, reversal is required only when an unjust result occurred." *Dinter v. Sears, Roebuck & Co.*, 252 *N.J.Super.* 84, 92, 599 *A.*2d 528 (App.Div. 1991). In this case, the result was just and should not be disturbed.

## XII

In his Point X, defendant contends the trial court erred when it refused to permit evidence of his prior non-involvement in prison disturbances. The trial court explained at length its reasons for prohibiting this evidence, and we affirm on this point essentially for the reasons stated by the court.

## XIII

In his Point XI, defendant contends the trial court erred in refusing to grant a mistrial based on the alleged failure of the prosecutor to provide details of witnesses' testimony which were not included in any reports. The point is without merit. *R.* 2:11–3(e)(2). We affirm the trial court's ruling in this regard for the reasons placed on the record.

## XIV

In his Point XII, defendant complains of the trial court's ruling that he could not ask leading questions of a witness called by a co-defendant. In fact, the witness, Walter .Saxon, had provided no testimony which was adverse to defendant Mance. He had merely testified to seeing inmates run back into the recreation area after the initial violence had subsided. The court's ruling was well within its discretion to control the examination of witnesses. *Cestero v. Ferrara*, 110 *N.J.Super.* 264, 273, 265 *A.*2d 387 (App.Div.1970), *aff'd*, 57 *N.J.* 497, 273 *A.*2d 761 (1971). Fur-

thermore, defendant has failed to indicate any way in which the trial court's ruling prejudiced his case.

## XV

In his Point XIII, defendant contends the trial court erred in refusing to permit the testimony of a prison spokesperson. *Pro se* defendant William E. Jones attempted to call Patricia Mulcahy and James Stabile, who were both spokespersons for the prison. The prosecutor objected, and the court conducted an *Evid. R.* 8 hearing. Patricia Mulcahy, the assistant public information officer for the Department of Corrections, testified with respect to statements she made to the press based on information about the riot which she had received from a prison administrator. The evidence was inadmissible hearsay outside any of the recognized exceptions and was properly excluded. *R.* 2:11–3(e)(2).

## XVI

In his Point XIV, defendant raises two questions with regard to the trial court's charge to the jury. He contends the trial court erred in failing to charge fourth degree aggravated assault as defined in *N.J.S.A.* 2C:12–1b(3), as recklessly causing bodily injury with a deadly weapon, and in including a charge on conspiracy.

On the first point, the trial court rejected the proposed charge on the ground that there was no evidence to support the mental state of recklessness and thus no rational basis for giving the charge. In the context of this case in which the evidence of purposeful attacks was overwhelming, the trial court was clearly correct, and the contention is without merit. *R.* 2:11–3(e)(2).

The conspiracy charge was simply part of the overall charge on accomplice liability. The trial court did not ask the jury to decide the issue of conspiracy as a separate charge. Each defendant had been charged both as a principal and as an accomplice under *N.J.S.A.* 2C:2–6. That section makes a person legally

accountable for the conduct of another when, among other things, he "is engaged in a conspiracy with such other person." *N.J.S.A.* 2C:2–6b(4). The trial court's authority for so charging is unquestionable. *State v. Brown,* 138 *N.J.* 481, 520, 651 *A.*2d 19 (1994); *State v. Schmidt,* 110 *N.J.* 258, 263–65, 540 *A.*2d 1256 (1988).

## XVII

In his Point XV, defendant contends the trial court erred in failing to merge for purposes of sentence his conviction for possession of a weapon for an unlawful purpose under count XVIII with his convictions for aggravated assault under count II and count IX. The trial court clearly explained its reasons for denying the requested merger:

> The court has not merged the defendant's conviction on Count 18, possession of a weapon for an unlawful purpose into the other convictions since the unlawful purpose for which the weapon or weapons were possessed was to inflict injury on as many correction[s] officers as possible beyond those who actually sustained injury. In other words, the defendant possessed the weapon not for the purpose of solely committing a specified assault upon a particular officer, but for the purpose of indiscriminately injuring as many officers as possible. Under the circumstances merger is not mandated. *State versus Truglia,* 97 *N.J.* 513 [480 *A.*2d 912] (1984).

That ruling was consonant with the established principles of law. *State v. Diaz,* 144 *N.J.* 628, 637–40, 677 *A.*2d 1120 (1996).

## XVIII

In his Point XVI, defendant contends that his sentence was excessive. On Count II, the second degree aggravated assault upon Captain Johnston, the sentence was an extended term of twenty years in prison, ten years to be served without parole. Count III was merged into Count II. On Count IX, the third degree aggravated assault upon Officer Leon Wilson, the sentence was five years in prison, two and one-half years to be served without parole. On Count XVIII, the weapons charge, the sentence was also five years in prison, two and one-half years to be served without parole. All sentences were consecutive to each other and to the term defendant was then serving. The appropriate statutory fines were imposed.

Defendant argues that the court made the following errors: (1) it relied on a presentence report prepared in 1977 regarding other charges; (2) it permitted the prosecutor to file a motion for an extended term six days after the fourteen days allowed for such motions by *R.* 3:21–4(e); (3) it failed to follow the four-part process set forth in *State v. Dunbar*, 108 *N.J.* 80, 527 *A.*2d 1346 (1987) for application of the extended term sentencing provision; (4) the evidence did not support the imposition of the maximum term on the extended term sentence; (5) the findings of fact were inadequate; (6) the parole ineligibility terms were routinely imposed; and (7) the length of the aggregate sentence should shock the judicial conscience.

We agree with defendant's first contention that the sentences may not stand because of the trial court's failure to order a complete presentence report. The court directed the probation department to use a presentence report on defendant which was created in 1977 and related to a crime committed in 1976 for which he was then serving time in state prison. Needless to say, the contents of that report were largely directed to the earlier crime. Other than listing the charges for which defendant was convicted in this trial, the report was either irrelevant or set forth material which was outdated, to say the least. The trial court's view that a new presentence report was unneeded since the court had acquired all the necessary information during the trial finds no support in the applicable court rule and statute.

*R.* 3:21–2 provides:

(a) Investigation. Before the imposition of a sentence or the granting of probation court support staff shall make a presentence investigation in accordance with *N.J.S.A.* 2C:44–6 and shall report to the court. The report shall contain all presentence material having any bearing whatever on the sentence and shall be furnished to the defendant and the prosecutor. In cases in which the death penalty will be imposed, a presentence report shall not be prepared.

(b) Examination. After the presentence investigation and before imposing sentence, the court may order, pursuant to *N.J.S.A.* 2C:44–6c, a physical or mental examination of the defendant provided that the defendant may not be committed to an institution for the purpose of that examination. The examination report shall be furnished to the defendant and the prosecuting attorney.

(c) Transmittal of Reports. If a custodial sentence is imposed, court staff shall, within fifteen days thereafter, transmit a copy of the presentence report and the examination report, if any, to the person in charge of the institution to which the defendant has been committed.

As is apparent, the rule by its own terms is mandatory. Furthermore, apart from a few exceptions none of which is pertinent here (*See* Pressler, Comment 3 to *R.* 3:21–2, at 817 (1997)), it has been so construed by the Supreme Court. *State v. Alvarado*, 51 *N.J.* 375, 240 *A.*2d 677 (1968). And under *N.J.S.A.* 2C:44–6(a) when the Rules of Court call for a presentence report, the court "shall not impose sentence without first ordering" it. Therefore, we are required to set the sentences aside and order the case remanded for re-sentencing based on a presentence report which fully accords with the dictates of *R.* 3:21–2 and *N.J.S.A.* 2C:44–6.

## XIX

In his last point, Point XVII, defendant contends that the cumulative weight of the errors denied him a fair trial. A defendant is entitled only to a fair trial, not one that is error free. *State v. Marshall*, 123 *N.J.* 1, 170, 586 *A.*2d 85 (1991), *cert. denied*, 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). The inquiry on review is whether the trial court's decisions prejudiced the defendant. *State v. Humanik*, 199 *N.J.Super.* 283, 306, 489 *A.*2d 691 (App.Div.), *certif. denied*, 101 *N.J.* 266, 501 *A.*2d 934 (1985). This was a long trial. The alleged errors, in our view, were not capable of prejudicing this defendant either individually or taken together. Thus, the principles set forth in *State v. Orecchio*, 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954), do not dictate the grant of a new trial.

Affirmed in part, reversed in part, and remanded for resentencing. We do not retain jurisdiction.