┌─────────────────────────────────────────────────────────┐
│                **NOT FOR PUBLICATION WITHOUT THE**        │
│              **APPROVAL OF THE APPELLATE DIVISION**       │
│                                                           │
│  This opinion shall not "constitute precedent or be binding upon any court." │
│   Although it is posted on the internet, this opinion is binding only on the │
│     parties in the case and its use in other cases is limited. R. 1:36-3.    │
└─────────────────────────────────────────────────────────┘

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1143-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WILLIAM C. COOPER, JR., a/k/a WILLIAM
SMITH and WILLIAM C. SMITH,

    Defendant-Appellant.

_____

Argued April 11, 2018 – Decided August 31, 2018

Before Judges Fuentes, Manahan and Suter.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 11-12-2963.

Seon Jeong Lee, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Seon Jeong Lee, on the brief).

Linda A. Shashoua, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Linda A. Shashoua, of counsel and on the brief).

PER CURIAM

Defendant William C. Cooper, Jr.[1], was tried before a jury and convicted of knowing or purposeful murder, N.J.S.A. 2C:11-3(a)(1)(2), felony murder, N.J.S.A. 2C:11-3(a)(3), five counts of first degree robbery, N.J.S.A. 2C:15-1, five counts of third degree criminal restraint, N.J.S.A. 2C:13-2(a), second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), second degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a), second degree possession of a handgun by a person previously convicted of one of the crimes listed in N.J.S.A. 2C:39-7(b), and conspiracy to commit armed robbery and criminal restraint, N.J.S.A. 2C:5-2. The trial court sentenced defendant to an aggregate term of 124 years, with 101 years, one month, and twenty-four days to be served without parole, as mandated by the No Early Release Act, N.J.S.A. 2C:43-7.2.

The central and dispositive issue in this appeal requires this court to determine whether the out-of-court identification made by the State's key witnesses was irreparably tainted by the suggestive setting in which it was made. Equally troubling is the testimony of a man who claimed defendant admitted to him that he committed these crimes, while the two men were detained together in the Camden County Jail. For the first time on appeal, defendant

---

[1] Defendant was tried together with his codefendant, Rashawn Carter.

also argues that the trial judge abused his discretion under <u>Rule</u> 1:8-2(d) when he failed to discharge two jurors while the jury was deliberating. Finally, defendant claims the jury's verdict must be vacated because it was tainted by a coercive environment during deliberations.

After reviewing the record of this trial and mindful of prevailing legal standards, we conclude the out-of-court identification of defendant made by the widow of the murdered victim in this robbery was irreparably tainted by the suggestive environment in which the identification was made. The law enforcement agents who were investigating these crimes brought the witness to the courtroom where defendant was to be arraigned on these charges, and asked her if she could identify him as one of the participants in the robbery. The witness, accompanied by a victim's advocate employed by the Camden County Prosecutor's Office (CCPO), made this identification as she sat in the courtroom and watched defendant enter the courtroom, escorted by Sheriff's Officers, handcuffed and wearing a prisoner uniform from the Camden County Jail. Although the witness' ability to speak and understand English is limited, and thus she may have not understood the verbal interactions between defendant and the judge, we conclude the prejudice caused by this manner of identification spoke for itself

and needed no further explanation. Consequently, this verdict cannot stand.

I

The Robbery

At approximately 8:40 p.m. on October 14, 2009, three men, later identified as defendant, codefendant Rashawn Carter, and a third individual, entered Alex's Bakery, located in the Township of Woodlynne in Camden County. The owners of the bakery, Oscar Hernandez and Silvia Ramos-Morales, husband and wife, were inside the bakery working. At trial, Ramos-Morales described what occurred during the robbery, including how her husband was killed. The following account is taken primarily from her testimony and the testimony of Giovanni Bautista, a customer of the bakery. Although Bautista was unable to enter the bakery during the robbery, he was able to describe one of the assailants based on what he saw through the windows. Both Ramos-Morales and Bautista testified at the trial through a court-appointed Spanish language interpreter.

The prosecutor used photographs of the bakery as a visual aid to guide the witnesses' testimony. Ramos-Morales testified that on the night of the robbery, a woman carrying a baby came into the bakery, asking to buy only a slice of a cake. This woman was later identified as Latasha Baker, the sister of codefendant

Carter. Hernandez told her that she could not buy a slice of that particular cake. Baker left the bakery but soon returned and again asked to buy a slice of that cake. Ramos-Morales testified that her husband again told Baker that the cake was not sold in individual slices. According to Ramos-Morales, Baker "continued arguing[,] . . . she wanted . . . to force us to give her that slice of cake."

At this point, Ramos-Morales testified that three assailants entered the bakery "to rob us." According to Ramos-Morales, the assailant, whom she later identified as defendant, was armed with a handgun and wore a hooded sweatshirt with the hood pulled over his head, a black face mask that covered his entire face, and gloves. Only his eyes were visible. Ramos-Morales and Bautista both testified that the assailant who was later identified as codefendant Carter, was wearing a red "Ed Hardy" jacket; he did not have a mask covering his face or gloves on his hands. The third unidentified assailant wore a black jacket with grey and white stripes.

According to Ramos-Morales, defendant walked towards the cash-register and pointed the handgun at Hernandez, who was standing behind the counter. She testified that

> at that moment [Hernandez ran] towards the kitchen and he was able to close the door, but the person followed him. And they forced the

door [open] and the person was able to push
the door.  He was able to put the gun in his
face and he shot at my husband.

Ramos-Morales testified that defendant was the man who fatally shot Hernandez.

Immediately after the shooting, the third man who had been standing guard at the front door of the bakery and codefendant Carter "gathered" all the patrons in the bakery and "took them towards the front and told them all to get down on the ground." The patrons were later identified as Blanca and Anayeli Ramirez, Felipe Lopez, and Latasha Baker and her infant child.  Ramos-Morales noted that "[t]he woman that had the baby, I remember that she did not go down on the ground."

Defendant gathered Lopez, Blanca, and Anayeli, forced them into the kitchen, and robbed them of whatever money they had on their person.  Ramos-Morales was able to stay hidden from defendant's view, and pressed an alarm button that the bakery had installed.  In the meantime, Carter and the third assailant unsuccessfully attempted to open the cash register. Ramos-Morales testified that before leaving the bakery, the man who had shot her husband noticed her while she was still pressing the alarm button, and motioned with his handgun for her to go into the kitchen. Around that time, someone yelled that the police were on their

way, and the men left the bakery.  Hernandez died from a gunshot wound to the left side of his chest.

## The Investigation

CCPO Sergeant Lance Saunders was the lead detective/investigator.  He interviewed Ramos-Morales.  She described the person who shot her husband as "tall, not a really short person but not that tall . . . ."  She told Saunders that the assailant was taller than him.  With respect to his weight, she again was less than precise.  She told Saunders that the assailant was a "little bit heavier than the others . . . ."  She was only certain about one detail: she did not see his face.

The CCPO also interviewed Latasha Baker as a witness and victim of the robbery.  Baker had entered the bakery with her then one-year-old son two times shortly before the robbery, ostensibly to buy a slice of cake.  She was inside the bakery when the three assailants entered.  She told the police officers who responded that the assailants took her cellphone during the robbery and gave the police her cellphone number.  Saunders secured a Communication Data Warrant to track Baker's purportedly stolen cellphone.  Using the cellphone number, United States Marshal John Husinger traced the location of the "stolen" cellphone to an address corresponding to Baker's house.

When the law enforcement agents responded to Baker's residence, she allowed them to enter. Using a hand-held signal monitoring device, the agents found the cellphone under her living room couch. Based on this discovery, Saunders asked Baker to explain how this allegedly stolen cellphone ended up under a couch in her home. According to Saunders, Baker gave three different reasons: (1) the assailants "probably knew that she was a single mother with two kids[,] so they broke into her house and put the phone back;" (2) the assailants "were trying to frame her;" and (3) the assailants "probably put it back so she wouldn't tell on them."[2]

Saunders reviewed Baker's cellphone records, and discovered that between 8:00 p.m. and 9:00 p.m. on the date of the robbery, there were approximately thirteen calls between Baker's cellphone and codefendant Carter's cellphone. All of the calls were placed in the general area of the bakery and Baker's home. Saunders also viewed the video security footage of the bakery from the night of the robbery. He saw Baker leaving the bakery for the first time, and walking towards a rear alley adjacent to the bakery. The video record also shows the three assailants emerging from the same alley a few minutes prior to the robbery.

---

[2] Defense counsel objected to this line of questions that required Saunders to relate what Baker told him as impermissible hearsay.

Saunders also spoke to Eddie Bell, the biological father of Baker's child. Saunders testified that Bell viewed the video recording from the security camera and identified the red Ed Hardy jacket codefendant Carter wore during the robbery as identical to a jacket he owns. Defense counsel objected to this line of questioning, characterizing Bell's identification of the jacket as "opinion" testimony and "pure speculation." The trial judge overruled the objection. At this juncture, the trial judge gave sua sponte instructions to the jury characterizing Detective Saunders as an expert witness. Defense counsel did not object.

Saunders also interviewed Vernon Carter,[3] codefendant Carter's brother. Vernon told Saunders that his brother admitted to him his involvement in the robbery. He told him that they were "supposed to . . . get the money and that's it" but the "robbery went bad." The CCPO secured an arrest warrant for Rashawn Carter and the U.S. Marshals Regional Fugitive Task Force executed the warrant and arrested codefendant Carter at his sister's house. The U.S. Marshals found Rashawn Carter and defendant hiding in a pantry closet and arrested both men.

---

[3] Because Vernon Carter has the same last name as his codefendant brother, we will refer to Vernon Carter by his first name. We do not intend any disrespect.

<u>The Out-of-Court Identification</u>

Detective Saunders informed Ramos-Morales that the CCPO had arrested two of the three men involved in the robbery of the bakery and murder of her husband, and were still working to find the third individual. Ramos-Morales testified at a <u>Wade</u>[4] evidentiary hearing conducted by the court on October 1, 2014. In response to the prosecutor's questions, she gave the following testimony, as interpreted by a court-certified interpreter:

> Q. At some point during the investigation, shortly after your husband was murdered, did Sergeant Saunders tell you some people had been arrested?
>
> A. Yes.
>
> Q. What did he tell you about the people who had been arrested?
>
> A. He said that they had just arrested two people, that one was missing. And they were working to find the other person.
>
> Q. As to the two people that had been arrested, did he tell you specifically what either of them had done during the murder?
>
> A. No.

Defendant and codefendant Carter were scheduled to be arraigned in October 2009. It is undisputed that members of the CCPO arranged to have Ramos-Morales transported from the bakery

---

[4] <u>United States v. Wade</u>, 388 U.S. 218 (1967).

and brought to the courthouse to observe the arraignment.  We do not know what, if anything, was said to her about the arraignment process during this trip.  The prosecutor continued her direct examination of Ramos-Morales with the following questions about the arraignment:

> Q. Did [Saunders] tell you anything about what those two people arrested had been wearing during the time of the murder?
>
> A. I don't remember exactly as far as the two that were arrested.  Well, then I came to [c]ourt and I saw two people in the [c]ourt, I recognized one of the persons.
>
> Q. Okay.  Now, I want to talk a little bit about that.  Before coming to [c]ourt did Sergeant Saunders tell you these two arrested people have a [c]ourt date?
>
> A. He said that I had to come to [c]ourt - - I had to come to [c]ourt to give my witness - - my testimony.
>
> Q. Okay.  But before you had to come testify, [sic] was there a time when you came and recognized someone and you didn't testify?
>
> A. Yes.
>
> Q. Did - - what, if anything, did anyone tell you was going to happen that day in [c]ourt?
>
> A. The day that I came and recognized the person I wasn't seated here, I was seated in the auditorium, or the audience.  One of the two people . . . sitting over there, there was one taller than the other, one was a little fatter.  One of the faces was more human than the other.

Q. Okay. Let me stop for a moment. I know you recognized someone. And I'm not asking how did you recognized that person; okay? What I . . . want to know is, what did anyone tell you was going to happen in [c]ourt before you came to [c]ourt? Did you know you were going to see the arrested people?

A. No. No, he said if I wanted to come to [c]ourt fine, the people may be there or they may not be there.

Q. Okay. Did Sergeant Saunders, or anyone else, say anything to you about trying to recognize anyone?

A. No.

At this point in the Wade hearing, defense counsel asked Ramos-Morales a series of questions intended to asses her ability to understand English, unassisted by the interpreter. Defense counsel noted that in the last "couple of questions," Ramos-Morales had been "shaking [her] head" seeming to understand the question before the interpreter completed the interpretation. Defense counsel asked Ramos-Morales:

Q. Do you understand . . . what I am saying?

A. Yes.

Q. Okay. Do you understand what I'm saying when I talk [sic] in English?

A. Some of the things I do, yes.

Q. Okay . . . [H]ow long have you been living in the United States now?

A. 14 years.

12

Q. Okay. So, . . . when this incident happened you had been living in the United States for about nine years?

A. More or less, yes.

At this point, the prosecutor objected stating: "I can represent to the [c]ourt that she's been taking English classes, but she's more comfortable with an interpreter and she does not understand enough to be able to testify without one." Defense counsel argued that he did not question the need for an interpreter when the witness was testifying. Counsel stated: "[M]y questioning is going to go towards what she understood in the [c]ourtroom prior to making the identification." The court overruled the prosecutor's objection and held that this was a "legitimate line of questioning about her ability to understand whatever was being communicated to her before that [c]ourt event."

The record shows that Ramos-Morales came to this country from Mexico in 2006. By that time, the bakery had been opened "for three years." The day Ramos-Morales came to court to see the arraignment, she was "picked up by members of the prosecutor's office." Although she had interacted with Saunders and other members of the CCPO before that day, she did not remember whether Saunders was in the car with her that day. She knew that Investigator Saunders was the person who was investigating her

13

husband's murder. In response to defense counsel's question, Ramos-Morales stated that a person from the CCPO named "Margarita" accompanied her in the courtroom on the day of the arraignment. "Margarita" was also in the courtroom earlier in the Wade hearing.

The record shows that when Ramos-Morales arrived for the arraignment, she sat in the courtroom audience. Defendant entered the courtroom in an orange jail jumpsuit, and was handcuffed and shackled. The probable cause statement that was read aloud for the record stated: "information had been received from a witness who . . . knew [defendant], [and] that he was the one that was in the video that had the gun and that shot the victim[.]" At the Wade hearing, Saunders testified that when defendant entered the courtroom, Ramos-Morales "immediately spoke out, and . . . communicated in Spanish [to her interpreter], and she immediately told me she recognizes the guy that shot her husband. I immediately said stop . . . We'll go back to the office[.]"

By contrast, at the Wade hearing, Ramos-Morales equivocated about what she told the CCPO about the out-of-court identification:

> Q. When you recognized the person you described to us as having shot your husband, did you say anything in [c]ourt right then?
>
> A. No.
>
> Q. Are you sure?

14

A. I don't exactly -- I don't remember what I said exactly.

. . . .

Q. [D]o you remember telling any of the people around you that you recognized someone?

A. I believe so. And -- and I have always told them, the person that killed my husband was that person. I've always said.

According to Ramos-Morales, she was able to identify defendant, despite the fact that the assailant who murdered her husband wore articles of clothing specifically arranged to conceal his face. Ramos-Morales nevertheless insisted that codefendant Carter "had a more human face[.]" However, when she looked at defendant: "You could see that . . . he was evil, he was bad. The way he walked." She further explained, "his walk, the way he walked, the way they walked in I saw them . . . His features."

At the conclusion of the arraignment, Ramos-Morales and Saunders left the courtroom and went directly to the Prosecutor's office to take an identification statement. There, Saunders asked Ramos-Morales to repeat what she had said in the courtroom. Specifically, Saunders asked her if she had recognized defendant as one of the two men who had robbed the bakery. Ramos-Morales clarified that she recognized defendant as the person who had shot her husband.

15

At trial, Ramos-Morales described her out-of-court identification of defendant. She explained that she was able to identify defendant as the man who murdered her husband because at the arraignment: "[he] had the face of a mean person . . . I thought he was the one that had shot at my husband because I observed the eyes of both of them and their head[s]. And when I was observing that person[,] I became scared." (Emphasis added). She reiterated that she was able to identify defendant because of "the features of his head and his eyes." She also claimed that she was not certain whether she had identified defendant during the arraignment or after.

### The Testimony of Michael Streater

After his arrest, defendant was detained at the Camden County Jail pending trial. He shared a cell with Michael Streater. Streater was charged with leaving the scene of a fatal accident and robbery. Streater entered into a negotiated agreement with the State, as represented by the CCPO, in which he agreed to plead guilty to leaving the scene of a fatal accident. In exchange, the State agreed to downgrade the robbery charge to third degree theft, and recommend the court sentence Streater to a term of imprisonment not to exceed six years, without any minimum period of parole ineligibility. The State also agreed to allow Streater to be released on bail on December 31, 2009, pending sentencing.

On January 11, 2010, Streater contacted the CCPO and spoke to Saunders about what defendant had allegedly told him while they shared a jail-cell at the Camden County Jail. While out on bail, Streater was arrested for driving while intoxicated and endangering the welfare of child by "putting children at risk of death or serious bodily injury." Streater negotiated a new plea agreement. In exchange for agreeing to testify as a cooperating witness in the State's case in chief against defendant, Streater would plead guilty to second degree endangering the welfare of child, N.J.S.A. 2C:24-4, and the CCPO would agree to recommend a maximum sentence of five years, <u>without</u> any minimum period of parole ineligibility, concurrent to the previous six-year term. Thus, by agreeing to testify against defendant, Streater negotiated a plea agreement that guaranteed no direct penal consequences for committing a serious crime involving the welfare of children, that he committed while on bail awaiting sentence for a crime that caused the death of the victim.

At trial, Streater testified that he remembered newspaper clippings from Philadelphia being sent to defendant while he was in the Camden County Jail. He read these newspaper clippings a couple of times. He testified that after he read these newspaper clippings, defendant began to open up to him and told him what actually occurred during the robbery of the bakery. According to

Streater, defendant initially told him he was not involved in this robbery. Streater testified that defendant eventually told him he was "locked up for [a] capital murder" that happened at a bakery. Streater claimed defendant never mentioned he wore a mask or made any effort to conceal his face, "but I guessed he disguised himself." Streater also claimed defendant told him that "the person's wife couldn't identify him because he had the mask on."

### Jury Deliberations

The jury began deliberating on November 12, 2014. Two days later, the jury sent out a note that stated:

> 1) [scratched out illegible]
>
> 2) Question from [J]uror #5:
>
> Deliberation process is too stressful, and she is asking to be substituted with one of the alternate jurors.
>
> 3) Can we re-review the video of masked man running into bakery?
>
> . . . .
>
> 4) We believe we are missing some evidence[.] Is there anything we don't have[?]
>
> . . . .
>
> 5) Last night Juror #11 looked up info on internet about the facts on everything in manilla [sic] folder.
>
> Is this OK?
>
> Can info be shared to all jurors?

After conferring with counsel, the judge brought out Juror Number 11. She confirmed that she had conducted internet research that morning, printed what she found, and brought those documents to court with her in a manila folder. The research included "Police Records" by the Reporters Committee for Freedom of the Press, Winter 2008, "How Reliable is Eyewitness Testimony" by the American Psychological Association, April 2006, and "Exonerations in the United States, 1989 to 2012," by the National Registry of Exonerations, June 2012. At the prosecutor's suggestion, the judge asked Juror Number 11 whether she had shared this information with other jurors and if there had been any response to this material from any other juror. Eventually, the following colloquy ensued:

> JUROR No. 11: What I said was that I couldn't sleep last night and that I needed some - - I needed to have a better understanding of certain things and that I went on the internet and I looked up two articles and a paper. And — that I read them. And that I printed them out — I didn't feel like I was violating my oath as a juror because I wasn't looking up the case but I read — you know, I felt like I had a better understanding of what my questions were. But I felt like I needed to share that because — but I didn't share what I read or what I took it from.
>
> The court: First off, did you show any of the other jurors any of the written materials?

JUROR No. 11: No.  I told them what — I said what the names of the articles were.

THE COURT: Okay.

JUROR No. 11: That's what I said.  I just said like this article from this paper.

THE COURT: So did you — I mean did you tell them it was about articles about eyewitness identification?

JUROR No. 11: <u>Yes</u>.

THE COURT: And exonerations.

JUROR No. 11: I said I had a question on eyewitness — eyewitness identification and I also had questions on when things got overturned due to erroneous eyewitness identification.  And I had questions on what could or could not be shared during an investigation by the press in the State of New Jersey and Pennsylvania.

THE COURT:  All right . . . was everybody within earshot when you were talking about this?

JUROR No. 11: <u>Yes</u>.  I came in this morning and said I couldn't sleep last night.  I had questions, you know, and this is what I -- I looked up and I said the names of the articles. I said, you know, I feel like I need to tell you that I did this.  I said I think I need to let you guys know that I did this.  And I did — I said I'm not going to say what I read --

THE COURT: So did you disclose to any of the other jurors the content of what you read?

JUROR No. 11: No, not what I read — I told them the article's name but not that according to this article this is this or that is that,

A-1143-15T1

no.  And I said, you know, I think this needs to get shared and if, you know, if it's okay to be shared then I think it's up to everybody else if they want to look at it or not.

. . . .

THE COURT: Did anybody say anything in response to the particular subjects that you were mentioning?

JUROR No. 11: No.

[(Emphasis added).]

The court then discharged Juror Number 11, and called each juror individually to ask what Juror Number 11 said to them about her research, and to determine if they could remain impartial in their deliberations.

Pursuant to Rule 1:8-2(d)(1), which authorizes a judge to discharge any juror "because of illness or other inability to continue," the judge also discharged Juror Number 5, who was approximately seven months pregnant.  Juror Number 5 explained that the stress from the deliberation process was too much for her to handle; she stated: "[M]y head was splitting and I was very anxious, I couldn't stop thinking about it.  I woke up in the middle of the night, I was thinking, I couldn't go back to sleep. I'm a usually calm person and I couldn't even sleep."  The judge selected two alternate jurors to replace Jurors Number 5 and 11.

The judge instructed the jury to begin deliberations as a new jury.

After deliberating for two days, the newly constituted jury sent a note that stated: "We are currently a hung jury and have not been able to reach a unanimous decision after days of deliberation. Where do we go from here?" Before the judge had an opportunity to respond, the jury sent another note, that stated: "We're trying a new strategy to reconsider our decision." Shortly thereafter, the jury sent another note that stated: "Juror 14 feels that juror 7 has preconceived notions on the case. She said she knew the area and specific details on it. Also, she recalls reading the paper."

After conferring with counsel, the judge sent for Juror Number 14 and asked: "[H]ow is it that you are saying here that she said she knew the area and specific details on it?" Juror Number 14 explained:

> [W]e were looking at a piece of evidence and [Juror Number 7] made reference and said there's a gas station here, there's Mount Ephraim here, speaking of a street, counting how many houses it was to a certain person. Just there's a lot of things that to me didn't make sense. Like, obviously she said she's from Camden so she knew the area, but to me she knew specific streets and like things right next to the bakery. That to me was like if you know this you probably know the bakery is here. And also a couple of days ago she was speaking about how she most likely read

22

the article about the incident . . . so she had prior knowledge to the incident.

The court then called Juror Number 7, who explained that her knowledge of the area was based on

> what was given to us, the big board, and my knowledge, which when we came up and asked the questions, I'm from the city, I'm familiar. So from looking on the board with the streets, something would indicate that it was a light. And I indicated what street the light was on. That was it, from my knowledge of the city and on the board from the street.

With respect to the article, Juror Number 7 explained that she might have read a newspaper article when the murder happened because she is from the same city, but it happened so long ago that she does not remember.

The judge again spoke with each juror individually to determine if Juror Number 14's note would affect their ability to be a fair and impartial juror. The following colloquy then occurred between the judge and Juror Number 7:

> THE COURT: Do you have any preconceived notions about the case?
>
> JUROR No. 7: I do not.
>
> THE COURT: Okay. Does the fact that apparently at least as of this morning somebody else on the jury thought you did, would that impact your ability to continue to be fair and impartial as a juror?
>
> JUROR No. 7: No.

THE COURT: Would it impact your ability to interact with that juror or any of the other jurors as part of your deliberations?

JUROR No. 7: Not at all.

After questioning each juror, the judge brought Juror Number 14 back into the courtroom and asked him whether he could continue to interact and deliberate with Juror Number 7 and the other jurors effectively as part of his deliberations. Juror Number 14 responded: "I'm just — I don't know. It's tough." The judge decided to bring each juror back to the courtroom and addressed the jury as a whole with a Czachor[5] charge:

> I've concluded that there's nothing, no information to indicate that outside information has been improperly interjected into this case . . . each of you must decide the case for yourself but do so only after an impartial consideration of evidence with your fellow jurors . . . do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or the effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

After a lunch break, the court again called Juror Number 14 into the courtroom and asked him whether, based on the instructions the court gave before lunch, he could continue to deliberate with the other jurors. Juror Number 14 responded: "I think my head

---

[5] State v. Czachor, 82 N.J. 392 (1980).

would be clear, I'll be alright to deliberate." The jury returned a unanimous verdict later that same day, finding defendant guilty on all charges described in the verdict sheet, except for conspiracy to commit murder. The court polled the jury as requested by counsel; each juror affirmed their position in open court.

A day later, Juror Number 7 emailed the Camden Jury mailbox requesting to send a note to the trial judge. Several days later, the trial judge received the following letter from Juror Number 7:

> This note is to inform you that I feel I was pressured to vote guilty. I left the court Tuesday night not knowing what happened. I was hit with [the] accusation because I was from the city in which the crime took place and may have heard about the crime [five years] ago that I was unfit to serve, although I wasn't the only one with doubt . . . [A] lot went on during deliberation, but Tuesday was heated. At one point I had to walk out [of] the room, and another moment I had to address [J]uror 9['s] use of profanity. I asked that we have a moment of silen[ce] several times, to cool things down. I went to the bathroom and came out to find they continued deliberating and came up with guilty for Murder bartering not guilty for murder to get guilty for another. I was in shock in the courtroom hearing all the guilty. I didn't remember agreeing to all that, when I was on the fence the whole time giving in at the last hour under unbelievable accusations and pressure . . . I felt like I was on trial, I was the only one asked if I knew the defendants although I wasn't the only one having a hard

time placing them there. (Now I know how it feels to be innocent in a room of people [who] feel you are guilty)[.] . . . . I felt myself defending myself although I was innocent . . . It wasn't right. I was on a [trial] sometime ago, and it was nothing like this. I was confident with my decision walking in on 11/18/14, and it changed an hour before it was all over. I would like to ask if any erased not guilty was on the paper, although I recalled some blanks that we [were] suppose[d] to go over. We started the paper work [the] day prior, and never went back over [it].

II

Defendant now appeals raising the following arguments.

POINT I

THE COURT ERRED IN ADMITTING VICTIM-WITNESS OUT-OF-COURT IDENTIFICATION THAT OCCURRED AT THE DEFENDANT'S ARRAIGNMENT, AN IMPERMISSIBLY SUGGESTIVE SETTING, WITHOUT PROPERLY WEIGHING THE RELEVANT SYSTEM AND ESTIMATOR VARIABLES TO SUPPORT ITS RELIABILITY FINDING.

POINT II

THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO FOLLOW THE RULE OF LAW TO DISCHARGE TWO DELIBERATING JURORS. R. 1:8-2(d)(1). (Not Raised Below)

POINT IV

THE COURT ERRED IN DENYING THE DEFENDANT'S NEW TRIAL MOTION WHERE THE VERDICT WAS REACHED BY COERCION AND INTIMIDATION.

26

POINT V

THE AGGREGATE SENTENCES OF 124 YEARS WITH 101 YEARS 1 MONTH AND 24 DAYS OF PAROLE INELIGIBILITY IS MANIFESTLY EXCESSIVE.

We begin our analysis with defendant's argument attacking the admissibility of Ramos-Morales's out-of-court identification. This is the central, dispositive issue in this case. The "standard of review on a motion to bar an out-of-court-identification . . . is no different from . . . [an appellate court's] review of a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (citing State v. Johnson, 42 N.J. 146, 161 (1964)). "The aim of the review at the outset is . . . to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." Ibid. (citing Johnson, 42 N.J. at 162).

"Appellate review of a motion judge's factual findings in a suppression hearing is highly deferential. [Courts] are obliged to uphold the motion judge's factual findings so long as sufficient credible evidence in the record supports those findings." State v. Gonzales, 227 N.J. 77, 101 (2016) (citations omitted). The factual findings of the trial court are accorded deference because an appellate court's "reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he

27

has observed firsthand." State v. Nash, 212 N.J. 518, 540 (2013). A "trial court's findings at the hearing on the [reliability and] admissibility of identification evidence are 'entitled to very considerable weight.'" State v. Adams, 194 N.J. 186, 203 (2008) (quoting State v. Farrow, 61 N.J. 434, 451 (1972)).

However, appellate courts "are not required to accept findings that are 'clearly mistaken' based on [an] independent review of the record." State v. Watts, 223 N.J. 503, 516 (2015). Further, a reviewing court "need not defer 'to a trial . . . court's interpretation of the law' because '[l]egal issues are reviewed de novo.'" Ibid. (alteration in original) (quoting State v. Vargas, 213 N.J. 301, 327 (2013)). In deciding the admissibility of Ramos-Morales's out-of-court identification of defendant, the trial court determined that the Supreme Court's seminal decision in State v. Henderson, 208 N.J. 208 (2011) applied, rather than the Manson/Madison[6] test New Jersey courts had previously relied on.

On August 24, 2011, the Court in Henderson adopted a "revised framework" to be used in evaluating the admissibility of eyewitness identification evidence. Henderson, 208 N.J. at 288. Writing for the Court, Chief Justice Rabner made clear that the ruling

---

[6] Manson v. Brathwaite, 232 U.S. 98 (1977); State v. Madison, 109 N.J. 223 (1988).

would only apply to "future cases," and would take effect thirty days after the Court approved new model jury charges on eyewitness identification. Id. at 302. In State v. Micelli, the Court examined an out-of-court identification that occurred before August 2011, and held that "the [Manson/Madison] standard applies . . . because the out-of-court identifications were completed prior to our August 24, 2011 decision in State v. Henderson . . . ." State v. Micelli, 215 N.J. 284, 287 (2013).

The out-of-court identification at issue in the present case occurred in October 2009. Accordingly, because defendant's identification predated Henderson, this court must apply the two factors articulated by the United States Supreme Court in Manson, 432 U.S. at 114, and adopted by the New Jersey Supreme Court in Madison, 109 N.J. at 232-33.

The two-step Manson/Madison test is applied when determining the admissibility of eyewitness identification and examines suggestiveness and reliability:

> a court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is

29

> reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence.
>
> [Madison, 109 N.J. at 232 (citations omitted).]

As for the first step:

> Impermissive suggestibility is to be determined by the totality of the circumstances of the identification. It is to be stressed that the determination can only be reached so as to require the exclusion of the evidence where all the circumstances lead forcefully to the conclusion that the identification was not actually that of the eyewitness, but was imposed upon him so that a substantial likelihood of irreparable misidentification can be said to exist.
>
> [Madison, 109 N.J. at 234 (citation omitted).]

In considering the second step, the court must consider whether the procedure created a "very substantial likelihood of irreparable misidentification." Madison, 109 N.J. at 232 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). "If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence." Ibid. "Reliability is the linchpin in determining the admissibility of identification testimony[.]" Micelli, 215 N.J. at 292 (quoting Manson, 432 U.S. at 114). "To assess the reliability of an identification," a court must consider "'[t]he opportunity of the witness to view the

criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" Ibid. (citations omitted).

"Procedurally, a defendant must first 'proffer . . . some evidence of impermissible suggestiveness' to be entitled to a Wade hearing." Henderson, 208 N.J. at 238 (quoting State v. Rodriquez, 264 N.J. Super. 261, 269 (App. Div. 1993)). If, at the Wade hearing, the "court decides the procedure 'was in fact impermissibly suggestive,' it then considers the reliability factors." Ibid. (citing Madison, 109 N.J. at 232). The State then "has the burden of proving by clear and convincing evidence that the identification[ ] . . . had a source independent of the police-conducted identification procedures." Id. at 238-39 (alteration in original) (citing Madison, 109 N.J. at 245). "Overall, the reliability determination is to be made from the totality of the circumstances." Id. at 239 (citing Madison, 109 N.J. at 233).

The State argues that Ramos-Morales's out-of-court identification of defendant was an unplanned and spontaneous identification, and that she was not brought to defendant's arraignment for the purpose of identifying defendant. In contrast,

defendant argues that Ramos-Morales was purposefully brought to the arraignment and instructed to observe the two defendants to see if she recognized them.

After conducting a Wade hearing, the trial court allowed Ramos-Morales to testify as to her out-of-court identification of defendant. In doing so, the trial court, though analyzing its decision under Henderson, relied on State v. Mance, 300 N.J. Super. 37, 58-59 (App. Div. 1997) and U.S. v. Jackson, 448 F.2d 963, 967-68 (9th Cir. 1971). In Mance, seven prison inmates were indicted as a result of offenses committed during a prison riot. Mance, 300 N.J. Super. at 43. During the riot, a victim-witness was attacked and stabbed repeatedly by three defendants, including defendant Mance. Id. at 46. The victim was initially unable to identify the defendants from a photo-array, but told the investigators that he believed he could identify his attackers if he saw them in person. Id. at 57. During the trial, the victim was sitting outside the courtroom waiting to testify when the seven defendants, on their way to their lunch break, walked by him in shackles. Ibid. At that point, the victim identified Mance as one of the defendants who attacked him. Ibid. At the Wade hearing, the investigator explained

> that he had arranged for [the victim] to be
> outside the courtroom that morning because he
> expected him to begin testifying before the

lunch break. He had no idea that the defendants would be coming through the hallway when they did. Nor did he conceive that [the victim] would see them in the hallway.

[Id. at 58.]

The trial court determined the identification was admissible, because "the exposure of the defendants to [the victim] was inadvertent." Ibid. The court also determined "that no one had done or said anything to influence [the victim's] identifications" and that the identification was reliable. Mance, 300 N.J. Super. at 58. On appeal, we affirmed the trial judge's determination that the defendant failed to sustain his burden of proving that this procedure was so suggestive as to result in a substantial likelihood of misidentification, stating:

> [T]he encounter in the courtroom corridor was inadvertent . . . [and] such accidental courthouse encounters [are not] unduly suggestive per se. Here[,] seven shackled defendants passed by the witness. Although he obviously knew they were the defendants in this case, there was nothing to indicate which of them were the men who attacked him. Therefore, there was no suggestibility with regard to his specific identifications of two of the seven as his attackers.

[Id. at 58-59 (citations omitted).]

In Jackson, several victim witnesses were attending a suppression hearing. Jackson, 448 F.2d. at 965. At the scheduled start time of the hearing, while the attorney for defendants was

in a conference with the judge, the three defendants were brought into the courtroom. Ibid. The victim witnesses observed the defendants at that time. Ibid. When the victim witnesses were called to testify, each identified some, but not all of the defendants, however, each defendant was identified by at least one witness. Ibid. One witness requested all the defendants stand up while she made her identification. Ibid. At the suppression hearing, each testified that their identifications were "based upon their observations at the time of the robbery, and they were not assisted by the [court-room observations]." Id. at 965-66. Defense counsel then moved to suppress the in-court identifications, arguing that the in-court observation of defendants "tainted the witnesses' ability to make reliable in-court identification[s]." Jackson, 448 F.2d. at 966. The motion was denied, and the witnesses were later permitted to make in-court identifications of the defendants at trial. Ibid.

On appeal, the Ninth Circuit held that the circumstances of the in-court observation of the defendants and the later in-court identifications were not so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," because:

> considering the totality of the circumstances,
> defendants were not deprived of due process
> under the Fifth Amendment . . . The

34 A-1143-15T1

circumstances which persuade us are: (1) the [in-court observation] was not planned by prosecuting or enforcement officials, but was inadvertent; (2) no officials indicated to the witnesses that the men led into the courtroom were the defendants in the bank robbery case, or even connected with the case in any way; (3) the assumption made by some of the witnesses that these were in fact the defendants appears to have stemmed as much from the witnesses' spontaneous recognition of the men based upon their observations at the time of the robbery, as from the fact that the men were seated at the counsel table; (4) all of the eyewitnesses who participated in the confrontation and later testified at the suppression hearing and the trial, testified that the confrontation did not assist them in making their in-court identifications; (5) there was substantial evidence, other than from these eyewitnesses, connecting the three defendants with the robbery; and (6) the inadvertent confrontation prior to the suppression hearing was less suggestive than the "stand up" procedure followed, in the presence of counsel and without objection, at the suppression hearing and the subsequent trial.

[Id. at 966-67.]

The court, in reaching that conclusion, explained that it "did not intend to intimate that we will, in other and more aggravated circumstances, condone the use by prosecuting attorneys of pre[-]testimony courtroom confrontations to 'firm up' the uncertain memories of potential witnesses." Id. at 967.

Defendant cites State v. Burden, 155 N.J. Super. 462 (App. Div. 1977) to support his argument that an identification at an

arraignment is per se illegal. In Burden, the defendant was convicted of robbing a loan office. Id. at 463. One of the witnesses was "requested by the police to attend an arraignment of defendant . . . [and] after viewing a few other individuals being arraigned, he indicated to the police that defendant looked like the robber." Id. at 464. On appeal, this court explained that:

> The entire atmosphere of an arraignment is suggestive of possible guilt of the suspect and in this case could well have influenced [the witness] in making his identification of defendant on that occasion. Ordinarily such illegality in the circumstances of an out-of-court identification would require a remand to determine whether the in-court identification by the witness was based on observations of the suspect independent of those at the illegal identification at the arraignment.
>
> [Id. at 465 (citing Wade, 388 U.S. at 240).]

However, this court determined that admitting the out-of-court identification, based on the totality of the evidence against defendant in the record, was harmless error. Id. at 466.

The Third Circuit, which encompasses New Jersey, has decided a case similar to the facts raised in this appeal. In United States v. Emanuele, 51 F.3d 1123, 1126 (3d Cir. 1995), the defendant was convicted of robbing two banks. Five weeks after the robbery, the teller at the first bank selected defendant's

photo out of a photo array, but "wasn't one hundred percent sure of her choice." Ibid. A few weeks later, she was shown a second photo array, and selected someone other than the defendant. Ibid. The teller from the second bank was similarly unable to identify the defendant from a photo array, and the fingerprints taken from both robberies did not match defendant's fingerprints. Id. at 1126-27.

Both tellers were called to testify at the defendant's trial, and after they met with representatives from the United States Attorney's Office, they were instructed to sit outside the courtroom. Id. at 1127. While they were waiting to testify, they saw the defendant being led from the courtroom by U.S. Marshals in handcuffs. Ibid. At that time, "outside the courtroom the two tellers talked to each other about defendant, telling each other 'it has to be him.'" Emanuele, 51 F.3d at 1127. Both tellers later made in-court identifications of defendant as the robber. Ibid.

On appeal to the Third Circuit, the court first determined that the witnesses' observation of the defendant was unnecessarily suggestive, concluding that "the confrontation was caused by the government, albeit inadvertently, and that to walk a defendant -- in shackles and with a U.S. Marshal at each side -- before the key identification witnesses is impermissibly suggestive." Id. at

37

1130. In determining whether the identifications were reliable, the court found the teller who had initially identified the defendant in the photo array's identification reliable, but the teller who did not identify defendant prior to observing him at the courthouse identification as unreliable. Id. at 1131. The court explained:

> [W]e face a situation in which the one eye-witness who would be able to identify the . . . robber and place defendant at the scene of the crime, could not, despite her opportunity to observe, recognize him in a photo array. That failure, coupled with the highly suggestive viewing of the defendant in conditions reeking of criminality, bolstered by the comments of another witness, render the in-court identification unreliable. The reaction "it has to be him" greatly diminishes the reliability of [her] identification and renders manifest the impact of her viewing defendant. In effect, the viewing communicated to the witness that the defendant was the robber, and there was no reliable evidence that she would have so concluded or testified absent that viewing.
>
> Under such suspect circumstances, there clearly was a substantial risk of misidentification.
>
> [Id. at 1131.]

Here, applying the Manson/Madison test, Ramos-Morales's out-of-court identification of defendant was impermissibly suggestive and resulted in a very substantial likelihood of irreparable misidentification. Ramos-Morales was brought to the arraignment

38

by members of the CCPO. She had been told by Saunders that two men had been arrested in connection with the robbery of the bakery and murder of her husband, and that the police were still looking for the third suspect.

Saunders testified that the CCPO did not ever use an arraignment as an attempted identification procedure, because it was not the CCPO's practice to do so. Saunders also testified that prior to the proceeding, he did not say anything to Ramos-Morales about her possibly identifying the defendants at the arraignment. However, at the <u>Wade</u> hearing, Ramos-Morales testified that she was told that to recognize defendants, it was necessary for her to attend the arraignment. She explained that she did not know if she would see the people who had been arrested at the arraignment, and Saunders had told her that "the people may be there or they may not be there."

Ramos-Morales, as a victim and witness of the robbery herself, had a right to attend the arraignment. N.J.S.A. 52:4B-36(p). However, her right to attend the arraignment has no bearing on the admissibility of her out-of-court identification of defendant that she made at that hearing. Ramos-Morales made her out-of-court identification of defendant at his arraignment, where the probable cause statement and criminal charges against defendant, naming him a suspect in the robbery and murder of her

husband, were presented and read in open court. Specifically, the probable cause statement stated, "information had been received from a witness who . . . knew [defendant], [and] that he was the one that was in the video that had the gun and shot the victim[.]"

Here, defendant attended his arraignment dressed in an orange jail jumpsuit, in handcuffs and in shackles. Also present at the arraignment was defendant's co-defendant, the individual who did not wear a mask when committing the robbery. At this time, though Ramos-Morales may not have understood exactly what was being said at the arraignment because the proceedings were not being translated, she was aware that the individual who was sitting in front of her, being presented before the judge in a criminal proceeding, was accused of participating in the robbery and shooting of her husband. Saunders explained that "[i]t was not a secret that he was a defendant that shot her husband because of the statements that we had received so — but I didn't tell her, you know, he shot your husband."

The trial court erred in analogizing Ramos-Morales's out-of-court identification to the out-of-court identifications in Mance and Jackson. In Mance, the identification was deemed admissible by the trial court because it was inadvertent, and because no one had done or said anything that would influence the victim's identification of the defendant. Mance, 300 N.J. Super. at 58-

40

59. Similarly, in Jackson, the court deemed the out-of-court identifications admissible because the identification was inadvertent and not planned by any officials, no one indicated to the witnesses that the inmates in the courtroom were the defendants in the case, the witnesses testified that their observations of the defendants did not assist them in making their in-court identifications, and there was other substantial evidence in the record that connected the defendants to the robbery. Jackson, 448 F.2d at 966-67.

Here, while Ramos-Morales's identification of defendant may have been inadvertent, it still occurred in a setting which was impermissibly suggestive of defendant's probable guilt. Unlike the identifications in Mance and Jackson, the arraignment alone was enough to influence Ramos-Morales's identification of defendant. The present case is more in line with Burden, where the defendant was actually identified at an arraignment. Burden, 155 N.J. Super. at 464. There, this court noted that the entire atmosphere of an arraignment suggests the possible guilt of the defendant, which can influence the witness if they make an identification of the defendant at the arraignment. Id. at 465.

At defendant's arraignment, he was charged criminally with participating in the robbery and with the murder of Ramos-Morales's husband. Additionally, like in Emanuele, the defendant was

41

identified by the key identification witness (Ramos-Morales) while he was wearing an orange jail jumpsuit and shackles. Though it is unclear how much of the charges Ramos-Morales understood, she was likely aware that defendant was being accused by the State of participating in the robbery of her bakery and murder of her husband. Moreover, the very nature of a criminal arraignment proceeding, where criminal charges are read in open court, and the fact that defendant was restrained in shackles and wearing clothes identifying him as a criminal defendant, is impermissibly suggestive of defendant's possible guilt.

Further, Saunders had informed Ramos-Morales that two individuals had been arrested, and that the people who committed the robbery and murder may or may not be at the arraignment. Unlike Mance and Jackson, Saunders clearly communicated to Ramos-Morales that the defendants accused of the robbery and murder would be at the arraignment, and it was clear that the inmates in the courtroom were likely the defendants in the case. There would be no other reason for Ramos-Morales to attend the criminal arraignment of defendant but for some communication from the CCPO that the defendants at the arraignment were the defendants who were accused of the robbery and murder in which she was a victim and witness.

Finally, it is unclear whether or not the out-of-court identification was actually planned by law enforcement. Ramos-Morales contradicted Saunders's testimony at the <u>Wade</u> hearing that he never asked her to possibly identify any defendant at the arraignment, because she testified that she was told it was necessary for her to attend the arraignment so that she could possibly recognize the defendants. Accordingly, Ramos-Morales's out-of-court identification of defendant occurred in an impermissibly suggestive setting.

Having determined that Ramos-Morales's out-of-court identification of defendant was in an impermissibly suggestive setting, the next step is to determine if the procedure used in identifying defendant resulted in a "very substantial likelihood of irreparable misidentification." In doing so, this court must evaluate the reliability of the identification. Courts may consider the opportunity of the witness to view the criminal at the time of the crime, a witness' degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the confrontation. <u>Micelli</u>, 215 N.J. at 292.

In regards to Ramos-Morales's opportunity to view defendant at the time of the crime and her degree of attention, she testified that the assailant who murdered her husband was wearing all black,

A-1143-15T1

in a sweatshirt with the hood on, and wearing a mask that completely covered his entire face so that she could only see his eyes. While the robbery occurred, Ramos-Morales stood in the corner of the bakery, behind the cabinets, pressing the panic button. She testified that after defendant shot her husband, and while he was bringing the bakery patrons into the kitchen, she observed his movements. She focused only on his head, and his eyes, and that he was a "little bit heavier than the other two guys." She was able to see his "manner of walking." She testified that defendant noticed her only after someone shouted that the police were on their way, and it was then that he pointed the gun at her and motioned that she should follow him into the kitchen.

Regarding the accuracy of Ramos-Morales's description of the person who shot her husband, she initially told detectives that the person who shot her husband was tall, but that she could not see the shooter's face. The time between the commission of the crime and the identification of defendant at his arraignment was about two weeks. Additionally, Ramos-Morales displayed a high level of certainty in her identification of defendant, explaining at the Wade hearing she was able to identify defendant because "he was a little fat. The eyes were square . . . You could see that he was — he was evil, he was bad. The way he walked . . . his features." At trial, she testified that "he had the face of a

mean person . . . I thought he was the one that had shot at my husband because I observed the eyes of both of them and their head.  And when I was observing that person I became scared."  She reiterated that she was able to identify defendant because of "the features of his head and his eyes."

Based on the totality of the circumstances of the out-of-court identification, Ramos-Morales's identification is not reliable, and lead to very substantial likelihood of irreparable misidentification.  First, the identification took place in a setting that impermissibly suggested that defendant was guilty.  Also present at the identification was the unmasked individual who robbed the bakery.  It is likely that Ramos-Morales recognized this individual as one of the men who robbed the bakery, and only identified defendant by association.  Second, after the robbery and shooting, Ramos-Morales described no personal characteristics of the shooter, and instead described only a tall person whose face was covered with a mask and a hood, and who wore all black.  However, at the <u>Wade</u> hearing, Ramos-Morales testified that she was able to recognize defendant because he had the "face of a mean person."  This is unlikely, because during the robbery and shooting, the gunman's face was completely covered except for his eyes, and Ramos-Morales was never able to see his face.

Ramos-Morales further testified that she was able to identify him based on the "features of his head," his eyes, and his "manner of walking." However, it is unlikely that Ramos-Morales was able to identify any features of the shooter's head as his face was completely covered with a mask and his head was covered with the hood of his sweatshirt. Witnesses were unable to see defendant's nose, mouth, or hair. Further, it is unlikely that Ramos-Morales was able to recognize defendant based on his eyes, because, during the course of the crime, which took about four minutes, Ramos-Morales was only able to briefly observe the masked gunman when he was escorting the bakery patrons to the kitchen, when he attempted to open the cash register, and when he escorted her to the kitchen. During this time, the masked shooter was constantly moving and at times not facing Ramos-Morales, so it not likely that she had the opportunity to view the individual's eyes without any obstructions. Additionally, regarding defendant's "manner of walking," she observed defendant walk into the arraignment while he was handcuffed and shackled. It is unlikely that her observation that day of his encumbered walking would be the same or similar to the manner of walking of the individual who shot her husband.

No other victims or witnesses identified defendant as the gunman. Ramos-Morales based her out-of-court identification

46

solely on the gunman's eyes, features of his head, and manner of walking. As demonstrated above, it is unlikely that Ramos-Morales would be able to identify defendant based on these characteristics alone. Instead, it is very likely that her identification was not based on her observations of the gunman during the commission of the crime, but instead based on the fact that defendant was appearing in an arraignment to be criminally charged with the robbery and the murder of her husband. Here, the procedure where the out-of-court identification was made was impermissibly suggestive, and resulted in very substantial likelihood of irreparable misidentification. As a result, the trial court erred in admitting Ramos-Morales's out-of-court identification of defendant.

The State argues that, if this court finds that the trial court erred in admitting the identification, the error was harmless, based on the "overwhelming evidence of defendant's guilt." We are not persuaded by this argument. It is far from certain whether, without Ramos-Morales's identification of defendant, there is any "overwhelming evidence of defendant's guilt." Her testimony was the only direct evidence of defendant's guilt.

Ramos-Morales's identification of defendant played an integral role in the State's case. In the absence of the

identification, the State's remaining evidence was Streater's putatively unreliable testimony and defendant's "consciousness of guilt" in hiding from the police on the date of his arrest. Under these circumstances, we are compelled to reverse defendant's conviction and remand this matter for a new trial. Based on this conclusion, we do not reach defendant's remaining arguments.

Reversed and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION